## Case No. 10,122.
N. E. SCREW CO. v. SLOAN.
[See Case No. 10,158.]

---

## Case No. 10,123.
NESMITH et al. v. CALVERT et al.

[1 Woodb. & M. 34; 2 Robb, Pat. Cas. 311; 17 Hunt Mer. Mag. 508.] [1]

Circuit Court, D Massachusetts. Oct. Term, 1845.

JURISDICTION—CITIZENSHIP OF POSSIBLE AND NECESSARY DEFENDANTS—SPECIFIC PERFORMANCE OF CONTRACT TO CONVEY A PATENT—"SUIT UNDER THE LAWS OF THE UNITED STATES"—INJUNCTION—EVIDENCE.

1. Where a bill in equity alleged, that one of several defendants contracted to transfer a pat-

---

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq. 17 Hunt. Mer. Mag. 77, contains only a partial report.]

ent (not then obtained) for a machine, and that after it was obtained he refused so to do; and that the other defendants, knowing these facts, bought machines of him; *held*, that as the suit could be maintained against him alone, the fact that some of the other defendants were citizens of the same state with the plaintiffs, was not fatal to the jurisdiction.

[Cited in Vail v. Hammond, 60 Conn. 384, 22 Atl. 957.]

2. A bill in equity to enforce a specific performance of a contract to convey a patent, is not "a case arising under the laws of the United States", as to patents, so as alone to give jurisdiction to its courts.

[Cited in Fuller & Johnson Manuf'g Co. v. Bartlett, 68 Wis. 79, 31 N. W. 749.]

3. But an objection on that account, or on account of the residence of the parties, should be taken before the pleadings are closed, and the evidence published. Semble.

4. If the bill prays for an injunction against the use of a patent, the question as to the issuing of that may come within the above laws of the United States.

5. A contract may be made to convey a future invention, as well as a past one, and for any improvement, or maturing of a past one. Allegations in bills need not set out all the facts, in detail, which are to be proved; but if they do not, they must contain general statements, under which the details proved are pertinent.

[Cited in Fuller & Johnson Manuf'g Co. v. Bartlett, 68 Wis. 80, 31 N. W. 749; Somerby v. Buntin, 118 Mass. 287; Vail v. Hammond, 60 Conn. 384, 22 Atl. 957.]

6. A deed, or other documentary exhibit, may be put in after the evidence is published.

[7. Cited in Groton Sav. Bank v. Batty, 30 N. J. Eq. 126, to the point that in a bill seeking to set aside a deed for fraud a general charge or statement of the matter of fact is sufficient, and that it is not necessary to charge minutely all the circumstances which may conduce to prove the general charge, for these are properly matters of evidence, which need not be charged in order to let them in as proof.]

This was a bill in equity, complaining that, about the 15th of February, 1841, Francis A. Calvert had invented a machine for picking and cleaning wool and cotton, and was then contemplating to make improvements thereon, and was preparing to take out letters patent for the machine and improvements. That the plaintiffs [John Nesmith and others], with Royal Southwick and William W. Calvert, being engaged in the woolen manufacture, and knowing the facts aforesaid, and the skill and ingenuity of said Francis, agreed with him that he should go on and mature and perfect his invention and improvements, and take out letters patent therefor, and assign and transfer the same to them, so far as they related to the subject of cleaning or burring wool. That about the 15th of February aforesaid, Francis A. Calvert proceeded to execute a deed to them, which was recorded in the patent office of the United States on the 25th of that month, selling and assigning to them the exclusive right of using said machine and improvements for the purpose last mentioned, and covenanted that he would use due diligence in maturing said invention and taking out letters patent therefor, and would assign the same, when

procured, to them, so far as regards wool, and would assign them to no other persons. That William W. Calvert in the same year conveyed his interest in the subject-matter to the complainants, and said Southwick his interest to William C. Appleton, who in September, 1843, transferred it to the complainants; that they thus became entitled to the exclusive use of F. A. Calvert's inventions, so far as respects the cleaning of wool; and that F. A. Calvert then proceeded to mature his improvement, and about 25th November, 1841, applied for letters patent; and they were then given to him in due form. The bill then avers, that about the third day of June, 1843, F. A. Calvert obtained other letters patent [No. 3,120], for additional improvements in cleaning cotton and wool; that the improvements, described in the two letters patent, are those contemplated and referred to in F. A. Calvert's deed to the complainants, and are embraced in its grants and covenants, and the complainants are entitled to transfers of them, so far as they relate to the latter subject; that the complainants hoped said Francis would assign them; but on the contrary, he has combined with the defendants and others, and utterly rejects and refuses to comply with his agreements, covenants and grants, and to transfer to them so much of them as concern wool, and has used, and allowed others to use them, and sold the same to the other defendants, and has derived great advantage therefrom. The bill then proceeds to pray for answers to certain interrogatories, and that F. A. Calvert may be required to perform specifically his agreements, and to transfer to them the patents aforesaid, so far as they relate to the cleaning of wool. And that an account may be taken of the machines made by him and the other defendants; and that they be restrained from the further use of said patents for the purposes before named.

The joint and several answer of the defendants admits, on the part of F. A. Calvert, his inventions, and an agreement for the conveyance of the right to use the first one for cleaning wool, to the persons named in the bill, and to mature the same; but denies that the agreement extended to the improvement contained in the second patent, or that the last improvement was contemplated in that agreement. He further denies any use of the machine invented in 1841, by himself, or others under him, for cleaning wool, except by way of experiment. The answer further avers, that after maturing his first patent, February 15, 1841, he did, on the 14th of October, 1841, convey to the complainants his said invention, and the letters patent about to be obtained for it; and received $1000 instead of the one fourth part of the income reserved in the former deed, and said F. A. Calvert is now, and always has been ready to make any other deed desired, of said first-named patent; but the same has never been requested as to either patent.

The answer moreover, throughout, denies any connection between the two patents, or any contemplation of the second one when the agreement was made and the first patent taken out, or any profit from either beyond an indemnity for expense, or any right in the complainants to any interest whatever in the last patent. The interrogatories are answered at length, and the other defendants profess to be either ignorant of the matters concerned generally, or admit or deny to the extent to which F. A. Calvert does. They, however, deny that they have made, or are making for F. A. Calvert, several of the machines included in the last patent. Some minor matters are stated in the answer, which need not be detailed here, but will be referred to, so far as material, in the opinion of the court, as also will be the evidence offered that has a bearing on the essential points in the case.

Warren & Rand, for complainants.
Giles & Dexter, for respondents.

WOODBURY, Circuit Justice. There is a preliminary objection to the jurisdiction of this court in the present case, which must first be considered. It was not made till the argument, after the pleadings to the merits, and after the evidence was taken and published. The ground of it is, that the matter in dispute does not arise out of or under the patent law itself, but under a contract to transfer a patent. I am inclined to think this objection is well founded in respect to the subject-matter, as our jurisdiction is extended in this class of cases so far as regards the subject-matter only to "all actions, suits, controversies, and cases, arising under any law of the United States, granting or confirming to inventors the exclusive right to their inventions or discoveries," &c. Act July 4, 1836, § 17 (5 Stat. 124). The present action or controversy arises rather under a contract concerning a patent afterwards to be obtained, than under the patent law itself. But the objection, if good against the jurisdiction of this court, merely on account of the subject-matter, does not impair it over Francis A. Calvert personally, as he belongs to a different state from the complainants; and his interests are several, and capable of being severed from those of the other respondents. The bill then, as against him, both on principle and precedent, gives the court jurisdiction by his residence, even if it does not by its subject. Ward v. Arredondo [Case No. 17,148]. See Shute v. Davies [Id. 12,828]; Cameron v. McRoberts, 3 Wheat. [16 U. S.] 591; Strawbridge v. Curtiss, 3 Cranch [7 U. S.] 267. The same reasoning authorizes it to be sustained as against Gay, who belongs to New Hampshire. But the objection is probably made too late to operate in favor of any of the respondents, as it was not stated till after answers were put in to the merits, replications filed, and the evidence published.

See D'Wolf v. Rabaud, 1 Pet. [26 U. S.] 476 498; Wood v. Mann [Case No. 17,952]; Harrison v. Urann [Id. 6,146]; Briggs v. French [Id. 1,871]; Skillern's Ex'rs v. May's Ex'rs, 6 Cranch [10 U. S.] 267. There seems, also, so far as regards the prayer for an injunction against the use of the patents, to be one ground of jurisdiction given over all the respondents on account of the subject-matter. Under these considerations, the preliminary objection to our jurisdiction must be overruled.

The next inquiry is, whether the complainants have made out a case justifying an interference to compel a specific performance, or an account, or to issue an injunction such as is prayed for. This depends upon the true intent of the original contract between the parties. The chief inquiry is, was that intended to include any thing not actually embraced in the first patent? This is resolved into two subordinate inquiries, ramifications of that. One is, did that contract by its terms, in their proper extent and meaning, look beyond the first patent, and thus mean to include more? And the next is, if not so, did it include more than was in the patent in consequence of some further improvement being known and contemplated at the time of the first patent, which was not inserted in it, though covered by the contract; being withheld as not matured and being suppressed, and afterwards introduced into the second patent? In either of those events, the complainants are entitled to the benefit of the improvement, and it ought, under the contract, to be conveyed to them; but not otherwise. The clauses in the original agreement, relied on to sustain the view, that all improvements, then or afterwards to be made by F. A. Calvert, in machines for burring wool, were to be conveyed to the complainants and no other persons, are these. He sells to them the exclusive right to clean wool, &c. "upon the machines invented or improved by" him, and "for which improvements I am now preparing to obtain letters patent of the United States." He then covenants to "use all due diligence and effort to mature my said inventions and improvements for cleaning wool, as soon as possible," and to take out letters patent therefor, and assign the same for cleaning wool to the complainants and to no other persons.

To bear on the construction of this instrument, it is further proved or admitted, that the complainants were manufacturers of woolens, and anxious to obtain possession and control of all the inventions for cleaning wool; that the said F. A. Calvert was an ingenious mechanic, and supposed to be making and able to make great improvements in the machinery for that purpose; that by an agreement made at the same time with that referred to, he was to receive one fourth of the profits from the use of all said improvements by the complainants; and that afterwards, on the 14th of October, 1841, he transferred that one fourth to them for the gross

sum of $1000, using language still stronger than in the first deed, and illustrative of it. In this last conveyance, after describing it as transferring his right under the original agreement, he adds, "Also my right to a certain improvement in burring wool," "to have and to hold" the same, as "described in his specification and caveat, and all my right and claim of whatever nature, under or by virtue of said agreement, and all my improvements in machines for burring wool, and all my right to any letters patent which may be obtained for the same." But the respondent, F. A. Calvert, denies, that either by the first or second deed any intention existed to convey any improvements he might make, except those then contemplated, and afterwards patented in November, 1841. The natural import of the language in the first deed certainly accords with this, rather than a more extended engagement, such as the complainants infer more particularly from the last deed, looking to all improvements on this subject made by him in all future time. The attendant circumstances of the parties and the subject-matter, so far as bearing on the construction of the agreement in the first deed, would not necessarily enlarge the construction to this extent. They are all consistent with the idea that improvements then thought of or started were the only subject-matter then contemplated to be transferred. Had the parties contemplated more, and wished to cover all improvements ever made at any future time by F. A. Calvert, explicit language to that effect would be likely to have been selected, as it would have been equally easy and more natural. Iggulden v. May, 7 East, 237, 241. But in the second deed by F. A. Calvert to the plaintiff, it is equally true there are some expressions that will bear a wider meaning, and they may have been introduced to cover what was doubtful in the first deed, and in consequence of a change in the consideration paid to F. A. Calvert, being, perhaps, deemed more advantageous to him; as it was a gross sum at once, instead of a share in remote and uncertain profits. Hence, after referring to the first improvements and the agreement in relation to them, he adds, as a part of the subject-matter conveyed in the second deed, what is susceptible of a construction much broader, viz.: "All my improvements in machines for burring wool, and all my right to any letters patent which may be obtained for the same." This language might, without any very strained interpretation, be extended to future improvements, as well as those already made, or to a second as well as first patent for them, and especially when it is recollected, that the complainants were desiring to purchase from F. A. Calvert and others all the machines, which might be useful in relation to this subject-matter: that F. A. Calvert was in embarrassed circumstances, and the complainants relieved him by the advances made

in October, when the second deed was executed; and that such engagements for the real benefit of inventors as well as the public, ought to be viewed literally when they tend to enable the inventors to continue their efforts, and eventually contribute to the public means and instruments for advancing useful industry and the arts.

But it is not necessary to form a decisive opinion on this point of the case, as I am satisfied on the other point that the balance of the testimony is in favor of the fact, that F. A. Calvert, before maturing his improvements and taking out his patent in 1841, had in contemplation, and had considered the further improvement patented in 1843. It would seem, however, that either, because he feared infringing Crane's rights, or had not time to finish the improvement in 1841, or entertained doubts of its superiority, or wished to reserve it for himself, he took out the patent of 1841, without including the same in it. It is not averred, nor is it necessary to infer, that he did this fraudulently. But that the principle of it had occurred to him in 1841, and had been in some degree tested, is quite clear, notwithstanding his denial, if we credit the testimony of William W. Calvert his brother, and of Mr. Crane. It is true, that William W. Calvert, though a brother, was a rival, and once had interests and feelings opposed to Francis A. Calvert. But he has no such interests at this time. So Crane was once interested in the patent. But neither of them seem now to be incompetent; and their manner of testifying is distinct and credible. Indeed, besides Crane's denial of any interest in it himself, the complainants offer now to show by a deed, that he had parted with all he possessed before giving his deposition, and put that in now as a documentary exhibit, though the evidence has been published. 2 Daniell, Ch. Prac. (Perk. Ed.) 1025. These witnesses testify to facts, which show distinctly, that the differences between the first patent, in November, 1841, and the second one in June, 1843, consisted chiefly in this—that the first had the angular tooth guard; and the latter dispensed with it, by using a receiver beneath, and bringing the saw cylinder nearer to the fine-toothed comb cylinder. Crane swears, that as early as the spring of 1841, Francis A. Calvert said the machine "could work without it," that is, without the angular tooth guard. And whenever he said that, a caution was given to him that he might then encroach on Crane's and William W. Calvert's patent, which seemed to deter him from then maturing such a change. Again, as to the angular tooth guard, Crane says, "I don't recollect that he said what he should use as a substitute, but he said he could do without it." The idea then had occurred to him, and the matter had been discussed, before his contracts with the complainants. William W. Calvert testifies, that the angular tooth guard could be dispensed with by bringing the cylinders nearer together and using a receiver, and such was the course of experiments tried in April, 1842, by his brother and himself. This was the second step in relation to the subject,—a series of experiments testing what he had thought of and talked of previous to his conveyances. He seems to have been deterred from resorting to this change in the spring of 1841, for some reason or other, and probably in part from threats of Crane that it would encroach on his rights; but that it was contemplated can hardly admit of doubt on examining the evidence. When he afterwards, in 1842, proceeded to develope this idea in a machine, he seems to have been conscious that it did not differ materially in principle from what he had patented in 1841, and should have been included in that; and hence he proposed to the complainants to buy back from them the patent of that year. The change was rather a further progress in the same machine, than inventing a new one; was maturing its form without introducing any new principle—was merely withdrawing the angular tooth, and substituting for it the receiver, and a nearer position of the saw cylinder to the fine-tooth comb cylinder. He told Crane that the machine would work without the angular teeth, before he obtained his first patent; and his brother came to that same conclusion with him; but the precise substitute, if any, or the change throughout, which he had in his mind, was not developed to them in detail, if it was matured, till 1842. But it being admitted, that in the winter of 1841 he had not matured any part of his invention—that his plans were but partially explained to any one—that the plaintiffs then, in advance of their completion and a patent, bought and he conveyed all of his improvements, such as they would be when matured—it was a natural form and design of the contract to reach every thing then in embryo in his mind on this subject; and after such a contract, it is equitable and just that it should pass the perfection or progress at any future day of any improvement in these machines, which he had thought of in 1841, and should at some future day complete. Under these circumstances, as the improvement in 1842 of what was patented in 1841, is proved in point of fact to have been only a further development of ideas entertained in 1841 on the same subject, we see no just reason why it should not be considered as assigned and granted to the complainants as was stipulated to be done in February as well as October, 1841, in terms covering at least all improvements he had then contrived.

It is hardly necessary to go much into various other points pressed by the counsel on the one side or the other. The bill distinctly avers that the improvements patented in 1843 were contemplated by said Francis A. Calvert in 1841, and hence the proof on this point is admissible, and the probata thus correspond, as they should, with the allegata. Story, Eq. Pl. § 264; The Chusan [Case No.

2,717]; 18 Ves. 312. I do not by this remark mean to be understood as expressing an opinion, that no evidence can be put in which is not alleged or specifically described in the bill; but there must be in the bill allegations broad enough to cover any evidence offered, before it becomes admissible. After that. confessions, or declarations. or documents, or cumulative facts are admissible to support any general allegations to which they apply; and such general allegations are alone often sufficient to render the introduction of such evidence proper. Smith v. Burnham [Case No. 13.018]; Jenkins v. Eldredge [Id. 7,266]. Nor is it necessary to examine in detail another question which the counsel have discussed,—whether a demand should be made for a conveyance of the patent of 1841 or 1843, before Francis A. Calvert is bound to convey them. For in all views of the deed and the testimony, he must be considered as having covenanted unconditionally to transfer them when obtained. 'He has long since received the consideration for doing it, and he now refuses absolutely to assign or grant the use of the last patent of 1843, which is a neglect of duty and violation of his contract sufficient to sustain the bill. Believing. for the reasons assigned, that he is bound to do it, so far as regards its use for cleaning wool, I think the prayers in the bill against F. A. Calvert ought to be granted; and the use of both patents for that purpose be assigned to the complainants,—conferring on them an exclusive license to use both in that way, and an injunction issue also to all the respondents, as all have interfered in making, or using. or vending these machines, to do so no more, for cleaning wool; and that they render an account of whatever has hitherto been received for the same beyond the expenses incurred. Decree for plaintiffs.